No. 22-16195

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ROBERT MILLER,

*Plaintiff-Appellant,*

v.

4INTERNET, LLC,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Nevada
Hon. Jennifer A. Dorsey
No. 2:18-cv-02097

---

## APPELLANT'S OPENING BRIEF

---

Mathew K. Higbee
Ryan E. Carreon
Naomi M. Sarega
**HIGBEE & ASSOCIATES**
1504 Brookhollow Drive, Suite 112
Santa Ana, California 92705
Tel: 714-617-8336
mhigbee@higbeeassociates.com
rcarreon@higbeeassociates.com
nsarega@higbeeassociates.com

*Attorneys for Plaintiff-Appellant Robert Miller*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF JURISDICTION ....................................................... 1

ISSUES PRESENTED ........................................................................ 3

SUMMARY OF THE ARGUMENT .................................................... 4

STATEMENT OF THE CASE ............................................................. 9

I.     INTRODUCTION ......................................................................... 9

     A.    Robert Miller Is A Professional Photographer .................... 10

     B.    4Internet Owns And Operates The 4Search Network ......... 11

     C.    Miller Captures A Photograph Of Fred The Goat. ............. 12

     D.    4Internet Displays The Goat Photograph On Its Websites. ... 12

     E.    The District Court Invokes The "Server Test". ................. 13

STANDARD OF REVIEW ................................................................. 14

I.     THE DISTRICT COURT'S JUDGMENT SHOULD BE REVERSED BECAUSE THE "SERVER TEST" IS NO LONGER VIABLE ................. 15

     A.    A Brief Explanation Of The Technology At Issue On This Appeal ... 15

     B.    The "Server Test" Conflicts With The Copyright Act's Definition Of A Public Display .......................................................... 19

     C.    The Principles Articulated By The Supreme Court In *Aereo* Call In To Question Whether The "Server Test" Remains Good Law. ..... 22

     D.    If The Court Abandons The "Server Test," It Could Still Achieve The Same Policy Objectives By Applying The Fair Use Doctrine. .. 24

II.    EVEN IF THE "SERVER TEST" REMAINS GOOD LAW, THE DISTRICT COURT'S JUDGMENT SHOULD STILL BE REVERSED ... 26

A.  The District Court Erred By Applying The "Server Test" To
Bar Miller's Theory Of Vicarious Infringement.................................26

III.  CONCLUSION ...........................................................................27

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*350 Mont. v. Haaland,* 50 F.4th 1254 (9th Cir. 2022)............................................14

*American Broadcasting Cos. v. Aereo, Inc*., 573 U.S. 431 (2014) …………..passim

*Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 571 (1994)..............................25

*Educational Testing Service v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999).26

*Erickson Prods. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) ...................................26

*Evox Prods. v. Verizon Media,* 2021 U.S. Dist. LEXIS 151460 (C.D. Cal. May 5, 2021)........................................................................................................................5

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-64 (9th Cir. 1996) ..........26

*Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162 (N.D. Cal. 2019)........5, 24

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018).............................................................................................................. passim

*Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1279 (11th Cir. 2008).19, 20

*Hunley v. Instagram, LLC*, 2021 U.S. Dist. LEXIS 177667 (N.D. Cal. Sep. 17, 2021)........................................................................................................................5

*Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at \*32 (N.D. Tex. Nov. 22, 2017)........................................................................................................20

*Logan v. Meta Platforms, Inc.,* 2022 U.S. Dist. LEXIS 194431 (N.D. Cal. Oct. 25, 2022)........................................................................................................................5

*N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) ...............................................22

*Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006)..4, 20, 24, 26

*Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1159 (9th Cir. 2007)...4, 6, 25

*Perfect 10, Inc. v. Giganews, Inc.,* 847 F.3d 657, 663 (9th Cir. 2017) ...................23

*Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 308 (2nd Cir. 1963) ...26

*UMG Recordings, Inc. v. Disco Azteca Distributors, Inc*., 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006)..............................................................................................26

*VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th Cir. 2019)..........................25

**Statutes**

17 U.S.C. § 101 ...............................................................................6, 19, 20

17 U.S.C. § 106(5)................................................................................19

**Treatises**

1 Patry on Copyright § 1:18 .....................................................................21

**United States Constitution**

U.S. Const. art. I, § 8, cl. 8 ....................................................................21

## STATEMENT OF JURISDICTION

This action arises under 28 U.S.C. § 1331 and the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ("Copyright Act"). *See* Excerpt of Record ("ER") 265-271.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is taken from an order and judgment of the district court granting a motion for summary judgment[1]. The order granting the motion for summary judgment was entered on July 5, 2022 (ER-265-271) and final judgment was entered that same day (ER-273). Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), a Notice of Appeal was timely filed on August 4, 2022. ER-259-263.

---

[1] The July 5, 2022, order granting the motion for summary judgment also included an order denying Appellant's motion for a stay. The portion of the July 5, 2022, order denying a stay is not part of the instant appeal.

## PERTINENT RULES AND STATUTES

Pertinent rules and statutes are reproduced in the addendum attached hereto.

## ISSUES PRESENTED

1.  Whether the "server test" articulated in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) conflicts with the statutory definition of "display" as articulated in 17 U.S.C. § 101.

2.  Whether the "server test" articulated in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) remains good law in light of the Supreme Court's decision in *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014).

3.  If it remains good law, whether and to what extent the "server test" articulated in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) applies to claims for direct infringement outside the context of search engines.

## SUMMARY OF THE ARGUMENT

Bolstered by the rise of social media platforms such as Facebook, Twitter, and YouTube, the launch of Netflix's on-demand streaming service, and the announcement and release of the very first iPhone, by many accounts the year 2007 was one of the most significant[2] of the Internet age.

In December of that year, the Ninth Circuit confronted a novel issue: whether the owner of a website that does not store electronic information on its own server is directly liable for violation of the exclusive right to display a copyrighted work if such owner inline links to or frames the electronic information stored elsewhere onto its own website. *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1159 (9th Cir. 2007) ("*Perfect 10 II*").

In *Perfect 10 II*, the Ninth Circuit considered a claim of direct infringement of the display right against Google based upon Google Image Search. The district court addressed two different questions: 1) did the thumbnail images that automatically pop up when a user types in a search term constitute direct infringements of the display right; and 2) did the full-size images that appeared on the screen after a user clicked on a thumbnail constitute direct infringements of the same display right. In answering these two questions, the court made a sharp distinction between the two based upon where the images were hosted. *Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) ("*Perfect 10 I*").

First, it found the thumbnails to be infringing, based on the fact that they were stored on Google's server. *Id.* at 844. Conversely, it held that the full-size images, which were stored on third-party servers and accessed by "in-line linking"—which works, like embedding, based upon the HTML code instructions—were not

---

[2] *See A nostalgic look back at the hottest tech the year the first iPhone appeared* https://www.cnet.com/pictures/nostalgic-look-back-hottest-tech-year-first-iphone-appeared/12/ (last visited November 10, 2022).

infringements. *Ibid*. It adopted the "server test", where whether a website publisher is directly liable for infringement turns entirely on whether the image is hosted on the publisher's own server, or is embedded or linked from a third-party server.

Over the next decade, the "server test" was rarely invoked—only a handful of District Court cases in the Ninth Circuit mentioned the "server test" in passing, with most simply acknowledging that it existed. At the same time, nearly every court outside the Ninth Circuit concluded the "server test" either narrowly applied to search engines or that it was wrongly decided. *See Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 590 (S.D.N.Y. 2018) (citing cases).

One district court within the Ninth Circuit seemingly agreed with the holding in *Goldman* noting that "[Defendant] has not provided *any* case within the Ninth Circuit applying the server test outside of the search engine context or in the context here, the wholesale posting of copyrighted material on a news site. *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162 (N.D. Cal. 2019) (emphasis in original).

However, just as it seemed that courts both in an out of the Ninth Circuit were trending away from a broad application of the "server test," a string of district court cases in the Ninth Circuit, including the instant case, seemingly reaffirmed the broad applicability of the "server test." *See Evox Prods. v. Verizon Media,* 2021 U.S. Dist. LEXIS 151460 (C.D. Cal. May 5, 2021) (dismissing complaint based on "server test"); *Hunley v. Instagram, LLC*, 2021 U.S. Dist. LEXIS 177667 (N.D. Cal. Sep. 17, 2021) (same); *Logan v. Meta Platforms, Inc.,* 2022 U.S. Dist. LEXIS 194431 (N.D. Cal. Oct. 25, 2022) (same).

With this history in mind, the District Court's grant of summary judgment in favor of Appellee 4Internet, LLC must be reversed for three reasons.

First, the "server test" provides that a claim for direct infringement of the display right cannot occur where the underlying copyrighted content is stored on a server controlled by a third-party. The location where the content is stored is the core

inquiry that governs the applicability of the "server test." However, nowhere does the text of the Copyright Act suggest that physical possession[3] is necessary in order to violate the display right. Rather, to display a work publicly means to "to transmit . . . a . . . display of the work . . . by means of *any device or process*." 17 U.S.C. § 101 (emphasis added). To transmit a display is to "communicate it by *any device or process* whereby images or sounds are received beyond the place from which they are sent." *Ibid.* (emphasis added). Devices and processes are further defined to mean ones "now known or later developed." *Ibid.*

Here, as the court in *Perfect 10 II* acknowledged, even though copyrighted material may physically reside on a third-party server, it is retrieved via a technological *process* facilitated by underlying lines of code known as Hyper Text Markup Language ("HTML") which are embedded into a subject webpage and provide instructions to the viewer's browser (*i.e.,* a device) which "interacts with the computer that stores the infringing image." *Perfect 10 II* 508 F.3d at 1161. It is this interaction that causes an infringing image to appear on the user's computer screen and as far as the viewer is concerned, "gives the impression that Google is showing the image within a single Google webpage." *Ibid.*

The interaction between the embedded HTML code on the subject webpage and the viewer's browser as described in *Perfect 10 II* clearly meet the statutory definition of "display" contained in §101, regardless of the location where the displayed copy physically resides.

---

[3] Physical possession may be required in order to violate other exclusive rights such as the reproduction right (§106(1)) or distribution right (§106(3)). However physical possession of a work is clearly not a threshold requirement for violation of *all* the rights enumerated in section 106. For example, an infringer need not be in physical possession of an original copy in order to create a derivative work (§106(2)) or to engage in a public performance (§106(6)) via an unauthorized rebroadcast. *See American Broadcasting Cos. v. Aereo, Inc.,* 573 U.S. 431 (2014).

Second, to the extent that the "server test" does not conflict with the express statutory language of the Copyright Act, it should be reconsidered in light of the Supreme Court's holding in *American Broadcasting Cos. v. Aereo, Inc*., 573 U.S. 431 (2014), particularly in light of the way the functionality of the Internet has evolved since the "server test" was announced.

In *Aereo*, an Internet-based re-transmitter of over-the-air television signals argued that it did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, was a "private" rather than "public" performance. *Id.* at 443-46. The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 444. "Viewed in terms of Congress' regulatory objectives," the Court asked rhetorically, "why should any of these technological differences matter?" *Id.* at 446. *Aereo* therefore provides that it is a practical, functional perspective, and not hyper technicalities, that determine whether a particular mode of content delivery is infringing or not.

The "server test" is wholly inconsistent with *Aereo*. Where a website publisher purposely constructs its website to show a copyrighted photograph as part of that website -- whether through HTML instructions, embed code, or "any other device or process" that has not yet been invented -- it is not only the website publisher's action but ultimately the reasonable viewer's perception that matters, regardless of the physical location of the image being displayed.

Third, to the extent the "server test" is still good law in the Ninth Circuit, the case law makes clear that it only applies to theories of direct infringement as opposed to theories of secondary infringement such as contributory or vicarious infringement.

Here, although Miller did advance a claim of direct infringement, he alternatively advanced theories of secondary infringement in both his cross-motion for summary judgment and opposition to 4Internet's motion for summary judgment. Despite this, the District Court did not address these alternate theories and instead determined that the "server test" acted as a complete bar to *any* theory of infringement advanced by Miller. Thus, the District Court erred in applying the "server test" outside the context of direct infringement.

The District Court should therefore be reversed, and this matter remanded for further proceedings.

## STATEMENT OF THE CASE

### I. INTRODUCTION

In 2017, a detainee at a facility located in the small town of Hackettstown, New Jersey made a daring escape just prior to his scheduled execution. *See* Excerpt of Record ("ER") 9-7, 18-20. Over the next year, he successfully evaded capture despite Hackettstown residents reporting numerous sightings. *Ibid.* Then on August 8, 2018, just hours after he had been spotted by local residents near the same facility, a mass breakout occurred with dozens of his fellow captives having been liberated via a suspiciously unsecured gate. *Ibid.*

On August 9, 2018, Appellant Robert Miller, on assignment for the *New York Post*, travelled to Hackettstown to investigate the incident. ER-6-8. After speaking with a local police officer to gather information, Miller began walking back to his car when to his great surprise, he came face to face with the fugitive himself: Fred the Goat. *Ibid.*

Acting quickly, Miller, a professional photographer with over 20 years' experience, pulled out his camera, swiftly adjusted the settings in order to create a sharp focus and minimize blur, framed his shot to take advantage of the best lighting possible and minimize the visual interference of any background elements, and took approximately 30 photographs. *Ibid.*

Over the next several hours, police and residents rounded up other escaped animals and returned them to the slaughterhouse from whence they had come. ER-6-8, 267-269. Shortly after the animals were secured, Fred was spotted headbutting the gate to their pen, apparently in an effort to help them escape once more[4]. *Ibid.*

---

[4] For the benefit of the concerned reader, it appears that Fred has since been captured and will live out the rest of his life on a farm upstate --- and no, that is not a euphemism. *Fred The Goat Will Live Out His Life On A Farm*, https://patch.com/new-jersey/hackettstown/fred-goat-will-live-out-his-life-farm (last visited November 10, 2022).

9

### A.    Robert Miller Is A Professional Photographer.

Appellant Robert Miller ("Miller") has been a professional photographer since 1991. ER-5. In 1991 Miller graduated with a B.F.A. from The Cooper Union which he attended on full scholarship. ER-5, 60-61.

Miller's photographs have been published in numerous magazines and newspapers such as *Time, Newsweek, LIFE, US News and World Report, Business Week, Stern, Der Speigel, Paris Match, Rolling Stone, Vanity Fair, Elle, People, New York Magazine, The London Times, The South China Morning Post, USA Today, The New York Times, NY Daily News, Newsday,* and *VOICE*. ER-5. Miller's work on 9/11 is in the permanent collection in The Library of Congress, published in several books was also included in a Bill Moyers *Frontline* documentary about 9/11 that appeared on PBS. *Ibid.*

In approximately 2000 or 2001, Miller began working as a freelancer for the *New York Post* ("*Post*"), and he continues to freelance for the *Post* today. ER-5, 62-64. Under this arrangement, Miller charges the *Post* a negotiated flat rate per shift for a non-exclusive editorial license to the photographs that he takes during that shift, and in exchange he gets to keep the copyrights to the photographs, which he can then license to third parties. ER-5, 74-83 Often, Miller is able to take photographs of interesting or notable events, and since he retains the copyrights to his photographs, his is able to command significant licensing value on the secondary market. ER-5-6, 65.

Miller typically never allows his photos to be used without payment of a license fee. ER-6. Since photography is Miller's sole job, he depends on the payment of license fees in order to make a living. *Ibid.* The unauthorized use of Miller's photographs has led to a rapid decline in the number of paid licenses and impacts the overall value of his photographs by diminishing exclusivity and causing Miller to

have to devote significant amounts of time and money to detecting and pursuing infringements. *Ibid.*

## B. 4Internet Owns And Operates The 4Search Network.

Founded in 2010, Appellee 4Internet, LLC ("4Internet") is a company that registers and sells domains and hosts web servers. ER-120, 125. Two of the domains that 4Internet owns are www.4jewish.com ("4Jewish") and www.4rightwing.com ("4RightWing"). ER-38, 126.

4Internet owns and operates over 1,000 domains in the "4Search network" all of which begin number "4" followed by a topic or "affinity type." ER-121-124. The purpose of 4Internet utilizing these affinity types is to allow users to self-select so that they can receive targeted search results based on topics of interest. *Ibid.*

This targeted search functionality begins with "seed points" which are domains preselected by 4Internet based on their relevance to a specific affinity type and that act as a starting point for a particular search conducted on one of the websites in the 4Search network. For example, one seed point for 4RightWing was a Wikipedia page that identified certain news outlets as right-wing and which was coded by 4Internet into its search algorithm. ER-131-133, 136-137, 170. Web crawlers start at these seed points and compile information deemed relevant into an "index" which is an organized compilation of information designed to be accessed quickly to produce a set of search results in response to a search query. ER-116-119, 130-131, 138, 157-159.

Once a webpage is indexed, it remains in the 4Internet index until a user performs a search query. ER-140, 151-154. After a query is entered into one of the domains in the 4Search network, a web page is generated based on specifications provided by 4Internet which tells the index which information to use to populate the page and how to compile that information to display through a user's browser. For example, 4Internet can set a limit to the amount of text that populates from the index

or can cause indexed photographs to be displayed or completely blocked on the page that is generated. ER-140-145, 149-150, 160-167.

### C. Miller Captures A Photograph Of Fred The Goat.

Miller is the sole creator of a photograph of "Fred the Goat" ("Goat Photograph"). ER-5, 20, 85-88. On August 9, 2018, Miller was given an assignment by the *Post* to investigate the mass break out of dozens of goats and sheep from a slaughterhouse in Hackettstown, New Jersey. ER-6. After a fortuitous encounter with Fred the Goat, Miller, utilizing his skill and experience as a professional photographer captured approximately 30 photographs, including the Goat Photograph. ER-6-8, 66-71.

After the assignment was completed, Miller submitted approximately 30 photographs to the *Post*, including the Goat Photograph. ER-7-8. Later that evening, the *Post* ran a story with the Goat Photograph titled "Rouge goat may have helped dozens of farm animals escape" ("*Post* Article"). ER-8, 22-24.

### D. 4Internet Displays The Goat Photograph On Its Websites.

On or about August 31, 2018, Eugene Sadowski ("Sadowski") conducted a Google reverse image search and discovered the Goat Photograph at issue in this case being displayed on two websites, www.4jewish.com and www.4rightwing.com. ER-10, 39, 42-43, 46, 92-95, 177-179, 254, 256-258. The Goat Photograph was displayed on 4Jewish and 4RightWing via an inline link directly from the *Post*'s website without any alteration by 4Internet. ER-135-135, 168. The Goat Photograph was then displayed on 4Jewish and 4RightWing above text from the *Post* Article. ER-177-179, 254, 256-258.

After discovering the Goat Photograph on 4Jewish and 4RightWing, Sadowski alerted Miller of the discovery by email and attempted to take screenshots of the webpages. ER-10, 109, 254, 256-258. Due to a malfunction in the screenshotting program used by Sadowski, the August 31, 2018, full page screenshot

of the page on 4Jewish generated a fragmented image; however counsel for Miller subsequently prepared a corrected version which, to Sadowski's recollection, appears to accurately reflect how the page displaying the Goat Photograph on 4Jewish appeared on August 31, 2018. ER-10-11, 15, 96-97.

    **E.**    **The District Court Invokes The "Server Test".**

On October 31, 2018, Miller filed a lawsuit against 4Internet alleging copyright infringement. ER-274. On November 1, 2021, the parties filed cross-motions for summary judgment on various grounds. ER-282-283. On July 5, 2022, the District Court issued a written order denying Miller's motion and granting 4Internet's motion. ER-265-271. In its order, the District Court stated that in light of the "server test" enumerated in *Perfect 10*, it did not need to address any of the various issues raised by the parties "because the parties agree that the goat photo never left *The Post's* servers and no law in this circuit imposes copyright-infringement liability for inline-linked images." ER-270.

While the District Court recognized Miller's various arguments attempting to distinguish the "server test," it noted that the "server test" was binding authority in the Ninth Circuit and encouraged Miller to "present these arguments to the Ninth Circuit." ER-270.

On August 4, 2022, Miller timely filed a notice of appeal. ER-259-260.

## STANDARD OF REVIEW

The appellate court reviews de novo a district court's order granting summary judgment. *350 Mont. v. Haaland,* 50 F.4th 1254 (9th Cir. 2022) (citation and quotation omitted).

## ARGUMENT

### I. THE DISTRICT COURT'S JUDGMENT SHOULD BE REVERSED BECAUSE THE "SERVER TEST" IS NO LONGER VIABLE

#### A. A Brief Explanation Of The Technology At Issue On This Appeal.

At issue in this appeal is the practice of inline linking[5]. The court in *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018) provided the following explanation of the practice, which it referred to as "embedding":

> A webpage is made up of a series of instructions usually written by coders in Hypertext Markup Language ("HTML"). These instructions are saved to a server (a computer connected to the internet), and when a user wishes to view a webpage, his or her computer's browser connects with the server, at which point the HTML code previously written by the coder instructs the browser on how to arrange the webpage on the user's computer. The HTML code can allow for the arrangement of text and/or images on a page and can also include photographs. When including a photograph on a web page, the HTML code instructs the browser how and where to place the photograph. Importantly for this case, the HTML code could instruct the browser either to retrieve the photograph from the webpage's own server or to retrieve it from a third-party server.

> "Embedding" an image on a webpage is the act of a coder intentionally adding a specific "embed" code to the HTML instructions that incorporates an image, hosted on a third-party server, onto a webpage. To embed an image, the coder or web designer would add an "embed code" to the HTML instructions; this code directs the browser to the third-party server to retrieve the image. An embedded image will then hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated webpage, a mix of text and images, although the underlying images may be hosted in varying locations. Most social media sites—Facebook, Twitter, and YouTube, for example—provide code that coders and

---

[5] The terms "inline linking", "embedding" and "framing" are used somewhat interchangeably in the case law to describe this practice although the true definitions denote slightly differing technical processes. *See* https://www.nolo.com/legal-encyclopedia/linking-framing-inlining-30090.html (last visited Nov. 10, 2022). For the purposes of this Appeal, Miller will refer to the practice as "inline linking" which, in counsel's opinion, appears to be the most accurate description of the technical process at issue in this case.

web designers can easily copy in order to enable embedding on their own webpages.

*Goldman*, 302 F. Supp. 3d at 587.

The Ninth Circuit website at https://www.ca9.uscourts.gov/ can be used as a practical example of how HTML code interacts with a user's browser to assemble a webpage. This is a picture of the home page of the Ninth Circuit website as it would appear to a visitor viewing the page through a browser:



/ / /

/ / /

/ / /

This is an example of some of the underlying HTML code[6] that makes up the Ninth Circuit website:



As described in *Goldman* these HTML "instructions" point to various pieces of information so that the user's browser can assemble that information to create the home page of https://www.ca9.uscourts.gov/. These HTML instructions are often referred to "tags" which are individual lines of code containing a specific instruction to the browser. In the example above, these "tags" are visible as purple text. One of these HTML "tags" visible on the Ninth Circuit website is the <img> tag[7] shown below in highlighted blue:

/ / /

/ / /

---

[6] On most browsers the HTML code for a webpage can be viewed by right-clicking on an empty area of the page and selecting "view page source" from the menu.

[7] A more comprehensive and interactive explanation of how this tag functions can be found at https://www.w3schools.com/tags/tag_img.asp. Miller respectfully requests that the Court take judicial notice of this website.

Because images are not directly inserted into a webpage, the <img> tag directs the user's browser to the specific location or "source" where the actual image file is stored so that it can be seamlessly integrated into the resulting webpage.

In this example, the <img> tag highlighted above references the source https://cdn.ca9.uscourts.gov/assets/images/header/9cir_header_COA.jpg which is the physical server location where the file of the image below resides:



Like the example above, the source image referenced by the <img> tag often resides on the same server as the webpage that the image is ultimately integrated in to. However, an inline link occurs when the source image referenced by the <img> tag resides on a third-party server not controlled person or entity whose webpage contains the <img> tag.

Regardless of whether an image on a webpage is inline linked or not, this "invisible, technical processes [is] imperceptible to the viewer" as the final integrated webpage would appear identical whether or not an inline link is used. *See Goldman*, 302 F. Supp. 3d at 595.

As relevant here, the *Post* uploaded Miller's Goat Photograph to its website as part of the *Post* Article. ER-20, 34-36. The Goat Photograph was then displayed on 4Jewish and 4RightWing via an inline link directly from the *Post*'s website, without any alteration by 4Internet, via a <img> tag specifically coded by 4Internet. ER-46, 130, 134-135, 167-168, 170-171, 177-178, 254, 256-258.

**B.** **The "Server Test" Conflicts With The Copyright Act's Definition Of A Public Display.**

The Copyright Act grants the owner of a copyright exclusive rights to, *inter alia*, "display the copyrighted work publicly." *See* 17 U.S.C. § 106(5). "To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process . . . ." 17 U.S.C. § 101. With regard to the meaning of 'publicly', the Copyright Act provides, in relevant part, that:

> [t]o perform or display a work 'publicly' means - -
> . . .
>
> (2) to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101.

Cases interpreting this definition have held that display occurs by "the projection of an image on a screen ... by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage retrieval system." *Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1279 (11th Cir. 2008). The definition's usage of the phrase "any other device or process" clearly brings showing a copy of a work through a computer within the statutory definition of "display." Thus, per the statutory definition, each unauthorized *showing* of a work through a computer infringes on the owner's right of public display.

Notably, the text of the Copyright Act does not make actual *possession* of a copy of a work a prerequisite for infringement. To "display" a work, someone need only *show* a copy[8] of the work via any device or process; a person need not actually

---

[8] Notably the definition does not require that the copy shown be an *infringing* copy. Rather, the statute's use of the standalone word "show" without the qualifying word "infringing" further demonstrates that a prospective infringer can violate the display right by impermissibly exploiting what would otherwise be a lawfully stored copy of an image on a third-party server.

possess a copy to display a work. *See* 17 U.S.C. § 101. And to display a work publicly, a person need only *transmit or communicate* a display to the public. *Ibid.* "The definition of 'transmit' is broad enough to include all conceivable forms and combinations of wired and wireless communications media." *Greenberg*, 533 F.3d at 1279-1280 citing H.R. Rep. No. 94-1476. Again, the person need not possess underlying copy in order unlawfully to transmit or communicate it to the public. *See Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at *32 (N.D. Tex. Nov. 22, 2017).

Under the express statutory definition, a website that utilizes an inline link to point to a third-party server where a file is stored publicly displays that image because the underlying HTML code placed by the website owner initiates a *process* whereby the user's browser *device* is instructed to *show* the copy of the image to the website's visitor from the third-party server by *communicating* it to the user via a seamlessly integrated webpage presentation.

In contrast to the statutory text, the Ninth Circuit's "server test" *requires* that the underlying copy physically reside on a server controlled by the infringer for a public display to occur – even if the image file location makes no material difference to the user viewing the website. Indeed, at the time the "server test" was originally proposed, the district court noted that its application was "susceptible to extreme or dubious results" and invited website owners to exploit this technological loophole to avoid liability. *Perfect 10, I,* 416 F. Supp. 2d at 839 ("Under the server test, someone could create a website entitled 'Infringing Content For All!' with thousands of in-line links to images on other websites that serve infringing content. That website, however, would be immune from claims of direct infringement because it does not actually *serve* the images." [emphasis in original]).

The instant case illustrates why wholesale application of the "server test" would undermine the underlying policy behind the copyright regime "[t]o promote

the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8; *see also* 1 Patry on Copyright § 1:18 (setting forth the history of the copyright clause and its origins at the Constitutional Convention in 1787).

It is not disputed that 4Internet is intended to be a money-making venture --- it registers and sells domains and also attempts to monetize its websites via paid advertising. ER-120, 124-125. It is also not disputed that Miller's Goat Photograph was displayed on 4Jewish and 4RightWing via an inline link directly from the *Post*'s website without any alteration by 4Internet. ER-134-135, 168. The result was a completely integrated page on the 4Internet websites containing both the Goat Photograph as well as text from the *Post* Article. ER-177-179, 181, 254, 256-257.

By exploiting this hyper technical loophole created by the "server test," 4Internet was able to retain all benefits of the viral content created by Miller --- increased user activity on its websites which ostensibly would increase the value of its domains and the potential to monetize them via sale or advertising – all the while avoiding legal liability or the obligation to pay the customary price for such content.

As the District Court conceded, Miller may have succeeded in establishing liability if he could show that 4Internet's conduct was "tantamount to copying and storing [the Goat Photograph] on 4Internet's own servers." ER-270. However, under the "server test" no liability could be had despite that whether the Goat Photograph was or was not stored on a 4Internet server made no material difference to the viewer of the content presented to them when visiting the 4Internet websites.

If 4Internet were allowed to freely use photographs with no need to pay a licensing fee by exploiting an invisible legal loophole, there would be no incentive for professionals such as Miller to create their works. Thus, rather than promoting the progress of useful arts as the framers intended, the "server test" instead encourages

website owners to retain all the material benefits of infringement while circumventing liability.

Because the "server test" is wholly inconsistent with the express text of the Copyright Act, and contravenes the Constitutional policy of promoting the progress of useful arts, the "server test" should be abandoned and the District Court's judgment reversed and remanded.

### C. The Principles Articulated By The Supreme Court In *Aereo* Call In To Question Whether The "Server Test" Remains Good Law.

The "server test" is not only inconsistent with the plain language of the Copyright Act, but it also runs contrary to the reasoning in *Aereo* which rejected the very sort of technical distinctions that underpin the "server test" in the first instance.

In *Aereo*, an Internet-based re-transmitter of over-the-air television signals argued that it did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, was a "private" rather than "public" performance. *Id.* at 443-46. The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 444. "Viewed in terms of Congress' regulatory objectives," the Court asked rhetorically, "why should any of these technological differences matter?" *Id.* at 446. *Aereo* therefore provides that it is a practical, functional perspective, and not hyper technicalities, that determine whether a particular mode of content delivery is infringing or not.

This reading of the statute is consistent with the Supreme Court's prior admonition that, to determine whether a work is infringed under the Copyright Act, a court must "focus on the [work] as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). For purposes of the display right, then,

it is the viewer's experience that matters, not the internal mechanics of how the content is stored or retrieved.

Since *Aereo* was decided in 2014, this Court has not had occasion[9] to consider the "server test" in light of the principles detailed by the Supreme Court to determine whether the "server test" remains viable. That occasion has now arrived.

The "server test" is wholly inconsistent with the principles of *Aereo* because it apportions liability exclusively on imperceptible, hyper technical mechanism unknown to the public viewer. Where a website publisher purposely constructs its website to show a copyrighted photograph as part of that website -- whether through HTML instructions, embed code, or "any other device or process" that has not yet been invented -- it is not only the website publisher's action but ultimately the reasonable viewer's perception that matters, regardless of the physical location of the image being displayed.

The re-transmitter company in *Aereo* was arguably a more passive participant in transmitting the performance right than is a user in the case here — who has no choice in what is displayed to him when he navigates to one of 4Internet's webpages. Furthermore, the principles that undergird the *Aereo* decision — chief among them that mere technical distinctions invisible to the user should not be the lynchpin on which copyright liability lies — apply with equal vigor here.

Thus, the Court should consider whether the "server test" remains viable in light of *Aereo*. If the Court determines that the "server test" is inconsistent with *Aereo,* the District Court's judgment should be reversed and remanded.

---

[9] The case *Perfect 10, Inc. v. Giganews, Inc.,* 847 F.3d 657, 663 (9th Cir. 2017) is the only Ninth Circuit Court of Appeals case counsel could locate that discusses both *Aereo* and *Perfect 10 II*. However, that case primarily concerned the doctrine of volitional conduct and did not address the "server test."

**D.    If The Court Abandons The "Server Test," It Could Still Achieve The Same Policy Objectives By Applying The Fair Use Doctrine.**

Should the Court decide to abandon or narrow the application of the "server test," that raises the question of how the Court could address the policy objectives that the "server test" sought to advance. Miller would submit that the well-established "fair use" analysis would achieve the desired balance between protecting the rights of content creators and encouraging artistic and technological innovation on the Internet.

A decade after the "server test" was announced in 2007, it essentially lay dormant both in and out of the Ninth Circuit, only meriting a handful of mentions in passing. Many of the courts outside the Ninth Circuit concluded that if the "server test" remained good law it should be narrowly construed in the context of search engines performing search functions. *See Goldman*, 302 F. Supp. 3d at 590 (S.D.N.Y. 2018) (citing cases). Indeed, at least one district court within the Ninth Circuit seemingly agreed with the holding in *Goldman* noting that "[Defendant] has not provided *any* case within the Ninth Circuit applying the server test outside of the search engine context. *Free Speech Sys., LLC,* 390 F. Supp. 3d at 1162 (emphasis in original).

No doubt the outcome of *Perfect 10*, and thus the adoption of the "server test" itself, was likely heavily influenced by the fact that the Google search engine was at the center of the controversy. The *Perfect 10* court rightfully recognized the potentially catastrophic implications of allowing search engines such as Google to be held liable for mass copyright infringement for simply allowing users to utilize its search function to surf the Internet. However, when applied outside the context of search engine functionality, the "server test" is more apt to produce the "extreme or dubious results" warned of. *See Perfect 10, I.* 416 F. Supp. 2d at 839.

As explained in Section II.C, *supra*, the Supreme Court in *Aereo* and *Tasini* counsel that a court must focus primarily on the end result as presented to, and

24

perceptible by the public rather than focus on hyper technicalities to determine whether a particular mode of content delivery is infringing or not. In the same vein the fair use doctrine "teach[es] the importance of considering the details and function of a website's operation in making a fair use determination" rather than simply relying on "talismanic terms" to serve as an on-off switch to determine liability. *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th Cir. 2019) (citing cases analyzing search engines in the context of fair use).

As demonstrated herein, the application of the "server test" is highly arbitrary and leads to results that invite website publishers to abuse and circumvent copyright protection by simply adjusting a few lines of code. In contrast, application of the fair use doctrine is fact intensive and requires a court to conduct an equitable case-by-case analysis rather than rely on bright-line rules. *See Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 571 (1994).

Indeed, in *Perfect 10 II*, the court engaged in a fair use analysis with respect to the thumbnail images stored directly on the Google servers. Much of the fair use analysis applied by the *Perfect 10 II* court in analyzing the thumbnail images could also have been applied to the full-sized images that were inline linked which would have achieved an identical outcome without having to invoke the "server test." *See Perfect 10 II,* 508 F.3d at 1165 ("Although an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information . . . a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool.").

Thus, if this Court determines that the "server test" is no longer viable, future courts confronting inline linking issues could still achieve the appropriate balance between protecting content creators and encouraging technology innovators by applying the well-established fair use analysis.

## II.     EVEN IF THE "SERVER TEST" REMAINS GOOD LAW, THE DISTRICT COURT'S JUDGMENT SHOULD STILL BE REVERSED

### A.     The District Court Erred By Applying The "Server Test" To Bar Miller's Theory Of Vicarious Infringement.

Courts recognize three doctrines of copyright liability: direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement.

To prevail on a vicarious liability claim, the copyright holder must prove the infringer has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity. *Erickson Prods. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019). Because it is a strict liability regime, a copyright holder need not demonstrate the defendant's intent to infringe the copyright in order to demonstrate copyright infringement. *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006); *see also Educational Testing Service v. Simon*, 95 F.Supp.2d 1081, 1087 (C.D.Cal.1999) (copyright infringement "is a strict liability tort"). Thus, the imposition of vicarious liability "even in the absence of an intention to infringe or knowledge of infringement, is not unusual. *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 308 (2nd Cir. 1963) (citations omitted); *see Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-64 (9th Cir. 1996) (following *Shapiro* and referring to it as the "landmark case" on vicarious liability for copyright infringement).

In *Perfect 10 I*, the court clearly stated that the "server test" was only meant to apply to claims for direct infringement:

> This test will merely preclude search engines from being held *directly liable* for in-line linking and/or framing infringing content stored on third-party websites. Copyright owners may still seek, as P10 does, to impose contributory or vicarious liability on websites for the inclusion of such content.

*Perfect 10 I*, 416 F. Supp. 2d at 844 (emphasis added).

In addition to asserting a claim for direct infringement against 4Internet, Miller also argued on summary judgment that 4Internet was vicariously liable for infringement because it has the ability to supervise and control the content on 4Jewish and 4RightWing by determining precisely the type of content that its users can be exposed to and how that content is ultimately presented while attempting to monetize its websites via domain sales and paid advertising. *See* ER-38, 120, 124-125, 140-145, 149-150, 160-167.

Despite the existence of these two independent theories of infringement advanced by Miller, the District Court did not separately address them, and simply held that the "server test" acted as a complete bar to Miller's copyright claims. *See* ER-270. This oversight constitutes reversible error because the "server test" only applies to claims for direct infringement, and not to secondary infringement theories such as vicarious infringement.

Thus, the judgment of the District Court should be reversed, and the case remanded further proceedings.

## III.   CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed, and the case remanded for further proceedings.

Dated: November 10, 2022                      Respectfully submitted,

<u>**/s/ Ryan E. Carreon**</u>
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6(b), Appellant Robert Miller states his belief that the pending case *Alexis Hunley, et al v. Instagram, LLC,* case 22-15293 raises the same or closely related issues. Namely, both cases seek to challenge the continued viability of the "server test" articulated in *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007).

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,098 words and 868 lines, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: November 10, 2022        Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile

**ADDENDUM**

**<u>Table of Contents</u>**

17 U.S.C. § 101……………………………………………………………………..A-1

## 17 U.S. CODE § 101 - DEFINITIONS

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

…

A "device", "machine", or "process" is one now known or later developed.

…

To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovis-ual work, to show individual images nonsequentially.

…

To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

…

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

A-1

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: November 10, 2022                    Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile