No. 22-16195

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

ROBERT MILLER,

*Plaintiff - Appellant,*

v.

4INTERNET, LLC,

*Defendant - Appellee.*

_____

Appeal from the United States District Court
For the District of Nevada
Case No. 2:18-cv-02097
Hon. Jennifer A. Dorsey

_____

**APPELLEE'S BRIEF**

_____

Ryan L. Isenberg
Isenberg & Hewitt, P.C.
600 Embassy Row, Suite 150
Atlanta, GA 30328
Tel: (770) 351-4400
Fax: (770) 828-0100
ryan@ihlaw.us

*Attorney for Defendant and Appellee*
4INTERNET, LLC

## Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1, **4INTERNET, LLC** makes the following disclosures:

1. For non-governmental corporate parties please list all parent corporations:

*None.*

2. For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

*None.*

3. If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*None.*

Isenberg & Hewitt, P.C.

Respectfully submitted,

Dated: January 17, 2023     By: /s/ Ryan Isenberg

Attorney for Defendant and
Appellee
4Internet, LLC

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES .....................................................iv

APPELLEE'S BRIEF ................................................................ 1

  INTRODUCTION ............................................................. 1

  ISSUE PRESENTED ......................................................... 3

  STATEMENT OF THE CASE .............................................. 4

    I.  Facts................................................................. 4

      A.  4Internet Operates a Search Engine and How the Page Containing the Alleged Infringing Image Was Created. . 4

      B.  What Exactly Was Generated (HTML of the Relevant Pages). 5

    II.  Procedural History .................................................... 7

    III.  Summary of the Argument .......................................... 8

  Standard of Review ........................................................ 8

  Argument ................................................................... 8

    I.  The Server Test is still the Law of the Ninth Circuit. ................. 8

    II.  The Server Test is not Clearly Irreconcilable with Aereo. ........................................................... 11

      A.  The Clearly Irreconcilable Standard is a High Bar ............... 11

      B.  The Server Test Has Been Affirmed After Aereo. .................. 12

      C.  Aereo and the Text of the Copyright Act. .............................. 13

      D.  Fair Use is a Statutory Affirmative Defense and is not a Substitute for the Server Test....................................... 18

      E.  Miller's Factual and Policy Arguments are Just Plain Wrong.................................................................. 19

    III.  Miller's Secondary Liability Claim Fails ............................22

      A.  Miller Failed to Plead a Claim for Secondary Infringement .. 22

      B.  4Internet Cannot be Secondarily Liable for Infringement .....23

C.  There Cannot be Secondary Infringement Because the NYP Had a License ............................................................ 26

Conclusion ..................................................................................... 26

FORM 17. STATEMENT OF RELATED CASES PURSUANT TO CIRCUIT RULE 28-2.6 ..................................................... 28

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ................ 29

CERTIFICATE OF SERVICE .................................................. 31

# TABLE OF AUTHORITIES

Page

**Cases:**

*Aleman Gonzalez v. Barr*
  955 F.3d 762 (9th Cir. 2020)  ............................................................... 12

*Am. Broad. Cos. v. Aereo*
  573 U.S. 431 (2014)  .............................................................. *passim*

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007)  ............................................................... 23

*Bell v. Wilmott Storage Servs., LLC*
  12 F.4th 1065 (9th Cir. 2021)  .......................................................... 12

*Burrow-Giles Lithographic Co. v. Sarony*
  111 U.S. 53 (1884)  ............................................................... 20

*Campbell v. Acuff-Rose Music, Inc.*
  510 U.S. 569 (1994)  ............................................................... 18

*Dream Games of Arizona, Inc. v. PC Onsite*
  561 F.3d 983 (9th Cir. 2009)  .......................................................... 22

*Ets-Hokin v. Skyy Spirits, Inc.*
  225 F.3d 1068 (9th Cir. 2000)  .......................................................... 21

*Garcia v. Google, Inc.*
  766 F.3d 929 (9th Cir. 2014)  .......................................................... 20

*Garcia v. Google, Inc.*
  786 F.3d 727 (9th Cir. 2015)  .......................................................... 20

*Garland v. Aleman Gonzalez*
  213 L.Ed.2d 102 (2022)  .......................................................... 12

*In Perfect 10, Inc. v. Giganews, Inc.*
  847 F.3d 657 (9th Cir. 2017)  .......................................................... 12

*Kwan v. Schlein*
  246 F.R.D. 447 (S.D.N.Y. 2007)  .......................................................... 23

*Lair v. Bullock*
  697 F.3d 1200 (9th Cir. 2012)  .......................................................... 11

iv

*Lopez v. Smith*
  203 F.3d 1122 (9th Cir. 2000) ........................................................... 8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*
  545 U.S. 913 (2005) ....................................................................... 24

*N.Y. Times Co. v. Tasini*
  533 U.S. 483 (2001) ....................................................................... 17

*Naruto v. Slater*
  888 F.3d 418 (9th Cir. 2018) .......................................................... 21

*Pecorino v. Vutec Corp.*
  934 F.Supp.2d 422 (E.D.N.Y. 2012) ............................................... 23

*Perfect 10, Inc. v. Amazon.Com, Inc.*
  487 F.3d 701 (9th Cir. 2007) .......................................................... 23

*Perfect 10, Inc. v. Amazon.com, Inc.*
  508 F.3d 1146 (9th Cir. 2007) ............................................ 2, 8, 10, 14

*Perfect 10, Inc. v. Giganews, Inc.*
  199 L.Ed.2d 385 (2017) .................................................................. 12

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*
  494 F.3d 788 (9th Cir. 2007) ...................................................... 23, 24

*VHT, Inc. v. Zillow Grp., Inc.*
  918 F.3d 723 (9th Cir. 2019) .......................................................... 12

## Statutes:

11 U.S.C. § 574 ..................................................................................... 19

17 U.S.C. § 101 ............................................................................... 13, 14

17 U.S.C. § 106 ............................................................................... 12, 13

## Other:

Sanford Meisner & Dennis Longwell, Sanford Meisner on
  Acting 178 (1987) ......................................................................... 20

**Appellee's Brief**

## INTRODUCTION

Appellee 4Internet operates a search engine using a network of topical domains. The search technology is the subject of a patent held by a sister entity. The primary domain is located at 4Search.com but the topically based search system includes a network of a wide variety of domains. At the time this action as filed, the search engine operated off of a single computer server. It has one employee – its founder. It has never generated revenue. It crawls the internet and in light of its resource constraints indexes primarily news sites including the New York Post ("the NYP").

Appellant Robert Miller is a photographer. Though he is technically a freelancer, functionally he is an employee of the NYP that licenses pictures to the post and separately retains the rights to his photographs. His images are licensed exclusively for thirty days to the NYP online site. As a practical matter there is no market for Miller's photographs and the only licenses he grants are to those he has obtained through legal demands or lawsuits.

On August 9, 2018, Miller took a picture of a goat that escaped. The picture was published online at the NYP website as part of a story about the escaped goat. 4Internet's search engine indexed the story. So did Google. On August 31, 2018, Eugene Sadowski (a retiree who

1

spends his days looking for infringements on behalf of his nephew, fellow NYP photographer Christopher Sadowski who himself gets a piece of claims asserted by his and Miller's counsel) claims to have found the story and image on 4Internet's site.

A demand was sent to 4Internet dated September 5, 2018, claiming infringement and demanding an arbitrary payment that conveniently could be paid online with a credit card. Trying to avoid the distraction and cost of being bullied, 4Internet disabled the link shortly after actually receiving the demand on September 24, 2018. That same day, 4Internet's counsel informed Miller's counsel that the image that was the subject of the demand was inline linked. In response, on September 25, Miller's counsel insisted that the image at issue was not inline linked and proceeded to file a one count lawsuit alleging direct copyright infringement on October 31, 2018.

Only after extensive discovery and motions practice Miller finally admitted that, in fact, the image in question was inline linked and resided on the NYP server. Under this Court's precedent in *Perfect 10, Inc. v. Amazon.com, Inc.,*[1] 508 F.3d 1146, 1159 (9th Cir. 2007), an inline

---

[1]  Because there are multiple cases involving "Perfect 10" as a party, all references to Perfect 10 in this brief will be to this case. Any one name reference to any other case involving Perfect 10 will be identified by the adverse party.

linked image is not displayed and is thus not infringing. Having so conceded, the trial court granted summary judgment. Miller now appeals.

Understanding that *Perfect 10* is the law of this circuit binding on a three-judge panel, Miller asserts that *Perfect 10* is "clearly irreconcilable" with the Supreme Court's ruling in *Am. Broad. Cos. v. Aereo*, 573 U.S. 431 (2014). Because this same argument has been briefed in Hunley v. Instagram, Case No. 22–15293 now pending before this Court, 4Internet will adopt and repeat arguments asserted by Instagram, Google, and the Electronic Frontier Foundation. The conclusion is that not only is *Perfect 10* not clearly irreconcilable with *Aereo*, but Perfect 10's interpretation is textually accurate, and summary judgment should be affirmed.

## ISSUE PRESENTED

Whether the district court correctly granted Appellee's Motion for Summary Judgment based on this Court's ruling in *Perfect 10* because, as Appellant himself concedes, the image at issue was not stored on Appellee's server but was inline linked to the NYP server.

## STATEMENT OF THE CASE

### I. Facts

### A. 4Internet Operates a Search Engine and How the Page Containing the Alleged Infringing Image Was Created.

The 4Internet search engine operates through a network of over one thousand domains that all begin with the number 4, which is referred to as the 4Search network. ER 120–121. As relevant to this case, among the 4Search network domains are 4Jewish.com and 4Rightwing.com, but the topics include sports such as 4baseball.com, professions such as 4accounting.com, and entertainment such as 4ballet.com.

The 4Search system works through an automated system that crawls the internet and then indexes and stores metadata. ER 53–54. The 4Search search engine extracts the keywords from the pages that its web crawler visits and uses those keywords to categorize the pages to provide better and more relevant search results. SER 250.

The NYP website makes its content available to search engines to index through RSS. SER 016–017. RSS stands for really simple syndication and is a mechanism used by website publishers to have their content discovered. Id., SER 012–013, ER 138–139. The 4Internet system automatically indexed the NYP website and stored the metadata that would allow a user doing a search at a 4Search domain to render the image at issue upon request. Specifically, as it relates to

4

the image at issue in this case, the 4Search crawler would have indexed the metadata from the NYP page that contained the article and image per the NYP RSS[2] instructions around August 9, 2018. SER 085–086.

It is of note that until Eugene Sadowski did his search and clicked on the result, the page that contained the inline link to the goat image did not exist. It was generated only as a result of the search itself. ER 151, SER 125, 126–127.

## B. What Exactly Was Generated (HTML of the Relevant Pages)

Lurking beneath what users see through their browser is computer code. The allegedly infringing page contains the following HTML instructions. Among the thirteen pages of HTML is the following:

```
<a rel="nofollow" href="https://nypost.com/2018/08/09/rogue-goat-may-have-helped-dozens-of-farm-animals-escape/" target="_blank"><img
class="img-responsive" src="https://thenypost.files.wordpress.com/2018/08/fred-the-goat-breakout.jpg?quality=90&strip=all&w=1200"
style="width:100%"></a>
```

SER 110.

---

[2]  For the Court's benefit, the NYP RSS feed as of January 20, 2020, can be found at SER 212-223. Beginning on the second page are links to the stories that are being pushed out about the then Australian Open tennis match followed by a shooting in Manhattan, etc. and continuing for another ten or so pages.

The reference to "src=" identifies the location source of the image, which is plainly on the NYP server.[3] The online published NYP story about Fred the Goat contains the following HTML:

```
192  <meta name="twitter:image" content="https://thenypost.files.wordpress.com/2018/08/fred-the-goat-
     breakout.jpg?quality=90&amp;strip=all&amp;w=664&amp;h=441&amp;crop=1" />
```

SER 140.

For the sake of clarity, as part of the demand sent to 4Internet, a screenshot taken by Eugene Sadowski (Image 2 below) actually shows the location source of the entire article.

---

[3]  The story is still up and the live location has been changed by the NYP to https://nypost.com/wp-content/uploads/sites/2/2018/08/fred-the-goat-breakout.jpg?quality=75&strip=all&w=744. It appears to have been downgraded in quality from when it was captured by 4Internet. See SER 194 Line 713. To further demonstrate the importance of the location, when the HTML from the 4Jewish page (SER 106-118) is loaded into a viewer the result is Image 1 below. As the Court can see, a small pixel is displayed because the instructions point to the location where the image previously resided but is no longer.

[The image below is Image 1 and is a continuation from footnote 3 above.]



ER 254.

Eventually, Plaintiff conceded that the image was inline linked.

## II.  Procedural History

Miller filed his complaint on October 31, 2018, alleging a single count of infringement. After discovery, the parties moved for summary judgment. 4Internet sought summary judgment on multiple grounds, but the Court granted 4Internet's motion for summary judgment only

pursuant to *Perfect 10*, supra on July 5, 2022. Miller filed his notice of appeal on August 4, 2022. Following the entry of summary judgment and before the notice of appeal was filed, 4Internet moved for attorney's fees on July 11, 2022, and the Court granted that motion on December 20. The attorney's fee award and amended judgment are not subject to this appeal.

## III.  Summary of the Argument

### Standard of Review

The standard of review is de novo. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). However, as there is no dispute that under this Court's precedent in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1159 that an inline linked image is not displayed and is not infringing, this Court can only avoid *Perfect 10* by finding that it is "clearly irreconcilable" with a later decided Supreme Court ruling in *Am. Broad. Cos. v. Aereo*, 573 U.S. 431.

### Argument

## I.  The Server Test is still the Law of the Ninth Circuit.

As Miller concedes, embedding or inline linking to an image that resides on another server does not constitute a display under the Copyright Act. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146

Google, also a search engine to state the obvious, indexed websites that themselves were infringing on Perfect 10's copyrights in various photographs that historically one could only see by purchasing a magazine. The Court adopted what came to be known as the "server test." The analysis this Court did in *Perfect 10* remains as true and applicable to 4Internet's search engine today as it did when the case was decided in 2007 based on facts that existed when it was filed back in 2004.

There the Court found that framing inline linked images are not displayed for purposes of the Copyright Act. It explained in relevant part:

> Because Google's computers do not store the photographic images, Google does not have a copy of the images for purposes of the Copyright Act. In other words, Google does not have any "material objects ... in which a work is fixed ... and from which the work can be perceived, reproduced, or otherwise communicated" and thus cannot communicate a copy. 17 U.S.C. § 101.

> Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen. The HTML merely gives the address of the image to the user's browser. The browser then interacts with the

> computer that stores the infringing image. It is this
> interaction that causes an infringing image to appear on the
> user's computer screen.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1160–61.

4Internet indexed metadata from the NYP RSS feed. SER 138–139.

The page seen in Image 2 above didn't exist until Miller's compatriot requested it, and only then did the system generate the page. ER 151. What was generated was HTML instructions that showed the user the NYP server through the 4Internet page. Just like Google in *Perfect 10*, 4Internet did not store the goat picture and it was not displayed for purposes of the Copyright Act.

## II.   The Server Test is not Clearly Irreconcilable with Aereo.[4]

### A.   The Clearly Irreconcilable Standard is a High Bar

Because a three-judge panel cannot overrule *Perfect 10*, Miller argues, as he must, that there is some superseding precedent that is clearly irreconcilable with *Perfect 10*. See *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012).

> The clearly irreconcilable requirement is a high standard. It is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent. In order for [this Court] to ignore existing Ninth Circuit precedent the reasoning and principles of the later authority would need to be so fundamentally inconsistent with our prior cases that our prior cases cannot stand. But if [this Court] can apply [its] prior circuit precedent without running afoul of the intervening authority, [it] must do so.

---

[4]   The arguments raised in this section are largely taken, with permission, from briefs filed in *Hunley v. Instagram* Case No. 22-15293 now pending before this Court. The primary issue** in both cases is identical – which is the "server test" and its survival post *Aereo*. The briefs are those filed by Instagram (Doc. 25) and Amici Google, et. al. (Doc. 32). Because of the obvious substantial difference in resources between 4Internet which generates no revenue and Instagram and Google, the arguments asserted in those briefs that are not specifically articulated are incorporated herein by reference to the extent the Court will permit.

**4Internet agrees with the positions taken by Instagram and its Amici that it shouldn't matter whether the party is a search engine, but 4Internet is a search engine so even if the Court were to find that *Perfect 10* shouldn't be applied beyond search engines, it would have no impact on this case.

*Aleman Gonzalez v. Barr*, 955 F.3d 762, 768–69 (9th Cir. 2020) (reversed on other grounds in *Garland v. Aleman Gonzalez*, 213 L.Ed.2d 102, 142 S. Ct. 2057 (2022) (all quotation marks and citations omitted). Nowhere in his brief does Miller actually articulate the clearly irreconcilable standard nor make any effort to analyze his position under that rubric.

## B. The Server Test Has Been Affirmed After Aereo.

Regardless of the *Aereo* opinion, which is discussed below, this Court has applied or affirmed the "server test" in three cases after *Aereo* was decided in 2014. *In Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) this Court affirmed its interpretation of the display right under 17 U.S.C. § 106(5). Though not discussed in the context of the display right, the *Giganews Court* considered *Aereo* and the Supreme Court denied Perfect 10's petition for certiorari.[5] The display right analyzed in *Perfect 10* was discussed in this Court's consideration of *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir. 2019). Most recently, in *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1072–73 (9th Cir. 2021) this Court extensively considered the "server test" citing *Giganews* as having affirmed it. *Aereo* was cited but only for the limited purpose of the Court's analysis of what constitutes volitional conduct.

---

[5]  *Perfect 10, Inc. v. Giganews, Inc.*, 199 L.Ed.2d 385, 138 S. Ct. 504 (2017).

## C.   Aereo and the Text of the Copyright Act.

Neither the interpretation of text of the Copyright Act ("the Act") nor the description of how the process works suggested by Miller are correct. 17 U.S.C. § 106(5)[6] identifies the rights at issue that apply to a photograph. Miller argues

> the text of the Copyright Act does not make actual *possession* of a copy of a work a prerequisite for infringement. To "display" a work, someone need only *show* a copy of the work via any device or process; a person need not actually possess a copy to display a work.

Opening Br. at 18–19 (emphasis suppled).

Miller argues that to display a work publicly, a person need only *transmit* or *communicate* a display to the public (Opening Br. at 20) (emphasis supplied). This argument fails to address the fundamental problem that what must be literally transmitted or communicated is an actual copy of a work and "copy" is defined in 17 U.S.C. § 101.[7] As noted above, this Court specifically determined as it relates to framed inline

---

[6]   . . . in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly

[7]   "Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which a work is first fixed.

images, such as the goat picture here, "because Google did not store a copy it did not have any 'material objects ... in which a work is fixed ... and from which the work can be perceived, reproduced, or otherwise communicated' and thus *cannot communicate a copy*." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1160–61 (emphasis added) (citing to 17 U.S.C. § 101).

Miller next argues that the ""server test" is not only inconsistent with the plain language of the Copyright Act, but it also runs contrary to the reasoning in *Aereo* which rejected the very sort of technical distinctions that underpin the "server test" in the first instance (Opening Br. at 22)." Later, Miller argues that the "server test" is "wholly inconsistent with the principles of *Aereo* . . ." (Opening Br. at 23). None of these arguments clears the high hurdle of the clearly irreconcilable standard. The *Aereo* opinion doesn't discuss § 106(5), the "server test," *Perfect 10*, or the definition of copy under § 101. Rather, *Aereo's* holding was limited to applying the public performance right under § 106(4) to a system that literally re-transmitted television broadcasts. That alone is sufficient to preclude this Court from finding that *Perfect 10* is not clearly irreconcilable with *Aereo*.

In *Aereo*[8], the Supreme Court considered whether an internet-based subscription service that streamed copyrighted television programs a few seconds after the over-the-air broadcast "publicly performed" copyrighted works within the meaning of the Copyright Act's Transmit Clause. *Am. Broad. Cos. v. Aereo*, 573 U.S. at 449. Relying on its use of individual antennae (rather than one antenna for all subscribers), Aereo argued that it did not "publicly perform," both because it did not "perform" and because even if it did "perform," those performances were not "public."

In holding that Aereo did "perform" the copyrighted works, the Court reasoned that Congress had amended the Copyright Act specifically to ensure that television systems fell within its scope, and Aereo bore an "overwhelming likeness to the cable companies targeted by the 1976 amendments." *Am. Broad. Cos. v. Aereo*, 573 U.S. at 443–44. The Court also held that Aereo's performances were "to the public," again relying on Aereo's similarity to the cable companies that Congress hoped to regulate in revising the Copyright Act, despite Aereo's use of individual antennae. *Id.* at 446–47.

---

[8]   This portion of the argument is taken virtually verbatim from the Instagram Brief at Pages 32-33 only removing those portions that applied specifically to the Hunley's opening brief.

The Supreme Court explicitly cabined its ruling to the particular technology at issue, in light of that technology's similarity to the technology used by cable companies.

The Court observed:

> We agree that Congress, while intending the Transmit Clause to apply broadly to cable companies and their equivalents, did not intend to discourage or to control the emergence or use of different kinds of technologies. But we do not believe that our limited holding today will have that effect. For one thing, the history of cable broadcast transmissions that led to the enactment of the Transmit Clause informs our conclusion that Aereo "perform [s]," but it does not determine whether different kinds of providers in different contexts also "perform."

*Am. Broad. Cos. v. Aereo*, 573 U.S. at 449.

Miller goes on to argue that

> the "server test" is wholly inconsistent with the principles of *Aereo* because it apportions liability exclusively on imperceptible, hyper technical mechanism unknown to the public viewer. Where a website publisher purposely constructs its website to show a copyrighted photograph as part of that website -- whether through HTML instructions, embed code, or "any other device or process" that has not yet been invented -- it is not only the website publisher's action but ultimately the reasonable viewer's perception that matters, regardless of the physical location of the image being displayed

(Opening Br. at 23).

This misses the point. First, the HTML instructions only point the user's browser to another location, in this case the NYP server. 4Internet has no control over what remains at that location. Because 4Internet doesn't store the image, if the NYP replaced the goat picture with dogs playing cards, then that is what will be displayed to the end user. Aereo actually saved the broadcasts on its server. See *Am. Broad. Cos. v. Aereo*, 573 U.S. at 436–7 (rather than directly send the data to the subscriber, a server saves the data in a subscriber-specific folder on Aereo's hard drive. In other words, Aereo's system creates a subscriber-specific copy—that is, a "personal" copy—of the subscriber's program of choice).

The argument that a user looking at a computer through a browser may not understand that the framed inline linked image is actually a view of the source is one of confusion, which is an issue for trademark law, not copyright. *Perfect 1*0 at 1161. Miller's citation to *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) in support of its position that the server test should be considered clearly irreconcilable with *Aereo* is puzzling since *Tasini* was decided before both *Perfect 10* and *Aereo* and cannot be considered as part of the analysis. To the extent the argument is limited to the notion that the rationale of the cases suggest that all that matters is what is seen and not how it is seen, then that argument fails because what is seen is a function of the user's browser settings. Though unusual as it may be, a user could simply view the

source code, which would result in reading HTML instructions that would only tell the user where to look for something without the ability to see anything. The fact is that there is no content that resides on the 4Internet server and there is no "copy" to transmit or communicate.

### D. Fair Use is a Statutory Affirmative Defense and is not a Substitute for the Server Test.

Miller argues that in lieu of the "server test," the Court should just apply the well-established "fair use" doctrine. But, fair use is a statutory affirmative defense found at § 107 that shifts the burden of proof to a defendant. See *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). It cannot be a substitute for an analysis applied to determine whether a plaintiff can make out a prima facie case for infringement in the first place.

Miller's argument has nothing to do with content creators (addressed below) and has everything to do with making it harder and more expensive for targets of large-scale copyright trolling operations and make it easier for Miller and his merry band of lawyers and compatriots to extort money from defendant's without reference to any actual analysis of whether an image's use is "fair".[9] Excluding this appeal,

---

[9]   These cases have nothing to do with art or photography. Christopher Sadowski gets ten percent of collections of Miller's claims and pays his Uncle Eugene a part of that. Eugene Sadowski spends seven days a week looking for possible infringements for about ten photographers. Chris says that Eugene would be responsible for a fair use analysis and

4Internet has spent approximately \$100,000[10] defending this case in which Miller was paid a day rate by the NYP whether he took any pictures or not. SER 077. He happened to take a picture that was published, but no one has ever asked him about licensing it. Id.

### E. Miller's Factual and Policy Arguments are Just Plain Wrong

Miller makes a baffling argument relating to the copyright clause. He argues that "rather than promoting the progress of useful arts as the framers intended, the "server test" instead encourages website owners to retain all the material benefits of infringement while circumventing liability" (Opening Br. at 21–22). The problem (besides the fact that nothing is stopping Miller from pursuing actual infringement) in modernity is that photography is no longer a useful art. Or, perhaps because everyone can do it it should be said that

---

Eugene says that would be up to the lawyers. SER 259, 262-264. Much like mass preference claims brought by bankruptcy trustees, legal analysis takes a backseat to financial analysis. This was recently reined in by Congress in amending 11 U.S.C. § 574(b) to require the trustee to exercise reasonable diligence into, and taking account of, affirmative defenses. Similar action by Congress would be nice, but the Courts then and still do retain jurisdiction to control litigants and lawyers before the bar.

[10] See <u>Miller v. 4Internet ECF 140</u> awarding fees and costs of \$100,000 to 4Internet.

photographers are vocalists.[11] Not that they cannot be art, or beautiful, or challenging – but the only thing required to produce a photograph is the dexterity necessary to press a button.[12] Though it is impossible to know the exact number of images that are created each day, as of November 11, 2020, Google had stored more than 4,000,000,000,000 images, estimated that 28 billion new pictures and videos were being uploaded (not just taken) every week, and Snapchat reported in 2017 that over 2,500,000,000 "snaps" were generated each day. SER 229–231.[13] This doesn't include video services such as YouTube, Instagram Reels, and Tik Tok. There is such a proliferation of whatever it is that may be called "content creation" that juxtaposed to one trying

[11]   See Judge Smith's dissent in *Garcia v. Google, Inc.*, 766 F.3d 929, 945 (9th Cir. 2014), on reh'g en banc, 786 F.3d 727 (9th Cir. 2015)

Just as an actor does far more than speak words on a page, … so too does a vocalist. Indeed, one might say that otherwise, every schmuck is a vocalist, because everyone ... knows how to read. (quoting Sanford Meisner & Dennis Longwell, Sanford Meisner on Acting 178 (1987) (quotation marks omitted).

[12]   4Internet is not suggesting that there should be no copyrights in photographs – only that the Courts have strayed so far away from the foundational analysis in which a photographer "pos[ed] the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation . . ." that there are now no actual requirements that the picture taker do anything. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 55 (1884).

[13]   Perhaps mostly by my own teenage daughter.

to create the next advance in search technology, any balancing test regarding what promotes the "Progress of Science and useful Arts" skews heavily in favor of providing the ability to search, index, and locate "content" that can be made by children and animals[14] with no effort or intent to create art – but which is presumed to be entitled to copyright protection given the obscenely low bar that remains from a time when being a photographer required something more than finding the right button on a camera.[15]

Finally, Miller brazenly mispresents to this Court that 4Internet is intended to be a money-making venture that attempts to monetize its website via paid advertising (Opening Br. at 21). The undisputed evidence is to the contrary. The purpose of the 4Search network was to come up with the "next generation of search." As noted in Section IV.B below, there was no revenue, no advertising, nor was there any acceptance of advertising. ER 31, SER 008–009. In fact, Levy testified that he had no idea if he would ever make money but he was creating technology and "pushing the ball forward for society." SER 102–103.

---

[14]  See *Naruto v. Slater*, 888 F.3d 418 (9th Cir. 2018) (monkey selfie case)

[15]  The bar is described as low, but of course the copyright office will register any photograph and the burden then shifts to disprove originality which is functionally impossible when a photographer's bare and subjective claim that he did something relating to lighting or an angle cannot be disproven meaning that there is no actual bar. See, e.g., *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1075 (9th Cir. 2000).

### III. Miller's Secondary Liability Claim Fails

#### A. Miller Failed to Plead a Claim for Secondary Infringement

Miller argues that even if he loses on the server test that summary judgment should be reversed because he argued during the summary judgment briefing that 4Internet could be liable under a claim of vicarious infringement.

However, secondary theories are

> distinct from the theory of direct infringement. While direct infringement requires proof of unlawful copying, contributory infringement requires proof that a defendant "(1) has knowledge of a **third party's infringing activity**, and (2) induces, causes, or materially contributes to the infringing conduct. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir.2007). Vicarious infringement requires proof that that the defendant exercises the requisite control over the **direct infringer** and that the defendant derives a direct financial benefit from the direct infringement. *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 729 (9th Cir.2007)

*Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 995 (9th Cir. 2009) (quotation marks omitted) (emphasis added).

In order to bring a claim for secondary infringement, it must have been pleaded in the Complaint. In *Dream Games*, this Court found that "had [it] intended to assert a theory of secondary liability, it should have done so either in the original or an amended complaint, following

proper procedure. Instead, the original complaint failed to provide "fair notice" to defendants of such liability," and Dream Games failed to amend the complaint under Rule 15(a) to allege that theory. *Id.* Here, Miller pleaded only a single claim of direct infringement (SER 278–285). He never sought to amend his complaint and 4Internet objected to such an argument in response to Miller's motion for summary judgment. SER 031–032. In *Pecorino v. Vutec Corp.*, 934 F.Supp.2d 422, 450–51 (E.D.N.Y. 2012) the District Court, in a patent case, citing *Kwan v. Schlein*, 246 F.R.D. 447, 452 (S.D.N.Y. 2007) but ultimately relying on *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) found that though "Plaintiffs need not make a pretrial election between the theories of direct infringement, inducing infringement, and contributory infringement, they still must adequately plead them each independently. Miller did not plead a claim for vicarious infringement.

### B.  4Internet Cannot be Secondarily Liable for Infringement

In *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 803 (9th Cir. 2007) this Court found that there could be no vicarious liability against a credit card company because it had no right or ability to control third-party infringement. It did so relying in part on *Perfect 10, Inc. v. Amazon.Com, Inc.*, 487 F.3d 701, 730–32 (9th Cir. 2007) (emphasis added)

> the . . . court held that Google was not vicariously liable for third-party infringement that its search engine facilitates. In so holding, the court found that <u>Google's ability to control its own index, search results, and webpages does not give Google the right to control the infringing acts of third parties</u> even though that ability would allow Google to affect those infringing acts to some degree.

And, even if Miller asserted a claim for vicarious infringement, he would still have to show that 4Internet profited from direct infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914 (2005). Indirect benefits are not sufficient. Rather, there must be evidence of direct financial interest in the infringing activity. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d at 802 (citation omitted). Miller argues that 4Internet attempted to monetize its website via domain sales and advertising (Opening Br. at 27). This is patently false and misleading as 4Internet did not generate any revenue in 2018 and did not sell any advertising. 4Internet's founder, Michael Levy, testified at his deposition as follows:

```
15        Q.   And so how do 4Jewish and 4Rightwing
16   generate revenue?
17        A.   They don't.
18        Q.   Are they attempting to generate
19   revenue?
20        A.   No.
21        Q.   Do you solicit advertising through
22   those?
23        A.   No.  I think there's an advertising
24   form on the page.  Not many people ever go there.  I
25   have not responded to it.  I don't think anybody has
```

Not content with that response, Counsel for Miller tried again.

```
 3        Q.   Okay.  So there is a page on the sites
 4   where someone could say, hey, I really want to
 5   advertise on 4Jewish?
 6        A.   It's part of the system.  They could.
 7   They never have, but they could.
 8        Q.   But you would accept advertising if it
 9   was the right advertiser?
10        A.   I don't actually respond to those
11   requests.  I get very few of them.  Most people are
```

Plaintiff has not and cannot demonstrate that Defendant profited or financially benefitted from a picture that would have been rendered on pages that no one saw and for which Defendant received no financial

benefit or interest nor can Miller advance any theory that because 4Internet happens to have sold a few domains that there is direct relationship between the sale of any domain and the goat picture at issue in this case. SER 249, ER 31, SER 100–103, ER 36. This is especially true considering that 4Internet disabled the link on September 24, 2018, approximately four days after having received the demand. SER 247.

### C. There Cannot be Secondary Infringement Because the NYP Had a License

As noted in the emphasized portions of the block quote in *Dream Games* above, secondary liability is dependent on someone directly infringing.

Regardless then of Miller's theory, his claim of vicarious infringement fails because there is no direct infringer. The embedded link pointing to the NYP site was displaying the goat picture under a license from Miller ER 5, SER 043. Because the NYP was not infringing, there is no third-party direct infringement that would support a claim for secondary liability.

## Conclusion

The "server test" enunciated in *Perfect 10* is controlling law. The text of the copyright act is consistent with the "server test," and the holding

in Aereo is not clearly irreconcilable with *Perfect 10*. In addition, Miller did not plead a claim for vicarious infringement and even if had, it would fail as a matter of law.

Based on the arguments raised above, the Court should affirm the order below granting 4Internet summary judgment.

Isenberg & Hewitt, P.C.

Respectfully submitted,

Dated: January 17, 2023              By: /s/ Ryan Isenberg

Attorney for Defendant and
Appellee
4INTERNET, LLC

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number: 22-16195**

The undersigned attorney or self-represented party states the following:

[] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[**X**] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

<u>Hunley v. Instagram</u>, Case No. 22-15293

Isenberg & Hewitt, P.C.

Respectfully submitted,

Dated: January 17, 2023          By: /s/ Ryan Isenberg

Attorney for Defendant and Appellee
4INTERNET, LLC

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number: 22-16195**

I am the attorney.

This brief contains **5,503** words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

<br>

Isenberg & Hewitt, P.C.

Respectfully submitted,

Dated: January 17, 2023          By: /s/ Ryan Isenberg

Attorney for Defendant and Appellee
4INTERNET, LLC

## Certificate of Service

I hereby certify that I electronically filed the foregoing **APPELLEE'S BRIEF** with the Clerk of the Court by using the Appellate CM/ECF system on January 17, 2023. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Isenberg & Hewitt, P.C.

Respectfully submitted,

Dated: January 17, 2023        By: /s/ Ryan Isenberg

Attorney for Defendant and Appellee
4INTERNET, LLC