No. 22-16195

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ROBERT MILLER,

*Plaintiff-Appellant,*

v.

4INTERNET, LLC,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Nevada
Hon. Jennifer A. Dorsey
No. 2:18-cv-02097

APPELLANT'S REPLY BRIEF

Mathew K. Higbee
Ryan E. Carreon
Naomi M. Sarega
**HIGBEE & ASSOCIATES**
1504 Brookhollow Drive, Suite 112
Santa Ana, California 92705
Tel: 714-617-8336
mhigbee@higbeeassociates.com
rcarreon@higbeeassociates.com
nsarega@higbeeassociates.com

*Attorneys for Plaintiff-Appellant Robert Miller*

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................. 1

II. THE SERVER TEST HAS BEEN UNEVENLY APPLIED BY DISTRICT COURTS IN THIS CIRCUIT ................................................. 2

III. THE SERVER TEST CANNOT BE SQUARED WITH THE PRINCIPLES ARTICULATED IN AEREO ........................................ 4

    A. Precedent Can Be Overturned When It Is Clearly Irreconcilable With The Reasoning Or Theory Of Intervening Authority. ......................... 4

    B. The "Server Test" Has Not Been Expressly Affirmed After *Aereo*. .... 5

    C. *Aereo's* Interpretation Of The Text Of The Copyright Act Is Irreconcilable With The "Server Test." ................................................. 6

    D. The Doctrine Of Fair Use Is Well Established And Context Specific In Contrast To The Highly Arbitrary "Server Test." ......................... 10

    E. 4Internet's "Originality" Argument Is Inapposite And Incorrect. ...... 10

IV. THE DISTRICT COURT FAILED TO CONSIDER MILLER'S SECONDARY LIABILITY THEORIES .................................... 13

    A. Whether Miller "Failed To Plead A Claim" For Secondary Infringement Is Not At Issue On This Appeal. .................................. 13

    B. Whether 4Internet Can Be Held Secondary Liable For Infringement Is Not At Issue On This Appeal. ............................................................. 14

    C. Whether An Underlying Infringement Exists Is Not At Issue On This Appeal. .................................................................................................. 17

V. CONCLUSION .......................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*American Broadcasting Cos. v. Aereo, Inc*., 573 U.S. 431 (2014)....................2, 5, 7

*Associated Music Publishers, Inc. v. Debs Memorial Radio Fund, Inc.*, 46 F. Supp. 829 (S.D.N.Y. 1942), aff'd, 141 F. 2d 852 (2d Cir. 1944)......................................12

*Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021)...............6

*Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) ....................................14

*Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1077 (9th Cir. 2000) .....................11

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996) ..........14, 15, 16

*Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019)....3

*Hunley v. Instagram, LLC*, 2021 U.S. Dist. LEXIS 177667 (N.D. Cal. Sep. 17, 2021)............................................................................................................................3

*In re Maurice*, 167 B.R. 114, 131-32 (Bankr. N.D. Ill. 1994) ................................10

*Incredible Features v. Backchina*, 2021 U.S. Dist. LEXIS 250121, at *6 (C.D. Cal. Dec. 16, 2021) ........................................................................................................3

*Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at *32 (N.D. Tex. Nov. 22, 2017)............................................................................................................7

*Logan v. Meta Platforms, Inc.,* 2022 U.S. Dist. LEXIS 194431 (N.D. Cal. Oct. 25, 2022)............................................................................................................................3

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, n.9 (2005)...14

*Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003)..............................................4

*Mills Music, Inc. v. Arizona*, 1975 U.S. Dist. LEXIS 11319, 1975 WL 21095 at *54 (D. Ariz. July 23, 1975) ....................................................................................12

*Narell v. Freeman*, 872 F.2d 907, 914 (9th Cir. 1989)............................................9

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 1991 U.S. App. LEXIS 1160, at *6 (9th Cir. Jan. 24, 1991) .....................................................................................13

*Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007)..............................2

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) ............................5

*VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th Cir. 2019)............................1

**Statutes**

17 U.S.C. § 101 ...............................................................................................8

17 U.S.C. §106(4)............................................................................................8

17 U.S.C. §106(5)............................................................................................8

## I.  INTRODUCTION

The majority of arguments made by Appellee 4Internet, LLC ("4Internet") concern factual and legal issues that were neither decided by the District Court nor raised on this appeal.

For example, 4Internet contends that it runs a "search engine" and that the offending webpage was allegedly created as a result of non-party Eugene Sadowski utilizing 4Internet's search function. *See* Opposition at pp. 4-5. However, this issue was contested below as Miller presented evidence that 4Internet's use of the Goat Photograph was not in the context of an image search nor was it an integral part of its affinity type targeted search functionality. *See VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 742 (9th Cir. 2019) ("[T]he label 'search engine' is not a talismanic term that serves as an on-off switch" rather a court must be cognizant of "the importance of considering the details and function of a website's operation" in making determination of infringement.).

The District Court never made and findings as to whether the infringement occurred as the result of 4Internet functioning as a "search engine," nor did it make any findings as to what legal significance, if any, that being a "search engine" has on the issue of liability for copyright infringement. *See* ER-268-270. Rather, the District Court's entire legal analysis turned on the application of the "server test" because the Goat Photograph did not reside on a server owned or controlled by 4Internet. *Ibid.*

Additionally, 4Internet makes various arguments about the legal sufficiency of Miller's claims of secondary liability. *See* Opposition at pp. 22-26. However, the District Court never addressed the propriety of Miller's secondary liability theory

except to imply[1] that this theory was barred by the "server test." *See* ER-268-270. Thus, whether Miller's secondary liability theory is legally viable is not ripe for decision by this Court.

Rather, the District Court's failure to even consider Miller's secondary liability theory is reversable error. The District Court resolved the summary judgment motions solely on the basis of the "server test," however the very court that announced the server test explicitly held that it only applies to theories of direct infringement, and that it does not apply to theories of contributory or vicarious liability. *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 844 (C.D. Cal. 2006) ("This test will merely preclude search engines from being held directly liable for in-line linking and/or framing infringing content stored on third-party websites. Copyright owners may still seek, as P10 does, to impose contributory or vicarious liability on websites for the inclusion of such content.") ("*Perfect 10 I*").

Finally, the few arguments that 4Internet makes that are relevant to the issue actually presented in this appeal must fail. When considering the clear and unambiguous reasoning in the Supreme Court's decision in *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), it is clear that the "server test" is no longer good law.

As such, the District Court should be reversed, and the case remanded for further proceedings.

## II. THE SERVER TEST HAS BEEN UNEVENLY APPLIED BY DISTRICT COURTS IN THIS CIRCUIT

4Internet's first argument is the "server test" is still the law of the Ninth Circuit, with its sole citation to the case *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ("*Perfect 10 II*"), which is the first and only Ninth Circuit case

---

[1] The District Court's Order never directly acknowledged that Miller asserted multiple theories of infringement, instead, it simply ruled that the "server test" presented an absolute defense to copyright infringement. *See* ER-268-270.

to apply the test. However, courts in this Circuit have been inconsistent in their application of the "server test" and whether the test should be broadly applied or is limited in scope.

After the "server test" was originally announced, it's application in this Circuit lay dormant for over a decade. The first district court to directly confront the "server test" declined to dismiss a complaint observing that the defendant had not "provided *any* case within the Ninth Circuit applying the server test outside of the search engine context or in the context here, the wholesale posting of copyrighted material on a news site." *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019) (emphasis in original).

Two years later, a district court granted summary judgment in favor of a copyright holder where the "Images were published on the [infringing] website using 'picture links,' meaning that they did not reside on Defendant's servers but instead were displayed on the page via an embedded link." *Incredible Features v. Backchina*, 2021 U.S. Dist. LEXIS 250121, at *6 (C.D. Cal. Dec. 16, 2021). The court further observed that "Defendant did not merely direct users to a third-party site that contained the Subject Images, it caused the Images to display on its own site." *Id.* at *13-14.

It was not until 2021, three years after Miller filed his case against 4Internet, that a string of district court cases in this Circuit seemingly reaffirmed the broad applicability of the "server test." *See Hunley v. Instagram, LLC*, 2021 U.S. Dist. LEXIS 177667 (N.D. Cal. Sep. 17, 2021) (dismissing complaint based on "server test"); *Logan v. Meta Platforms, Inc.,* 2022 U.S. Dist. LEXIS 194431 (N.D. Cal. Oct. 25, 2022) (same).

In sum, while the "server test" is the law of the Ninth Circuit,[2] the scope of the application of the test is not as settled as 4Internet seems to imply. District courts of this Circuit have been inconsistent as to whether the "server test" applies broadly, or whether its application is limited in scope in some manner[3]. If the Court is inclined to continue to apply the "server test," Miller requests that this Court clarify the scope of its application.

## III. THE SERVER TEST CANNOT BE SQUARED WITH THE PRINCIPLES ARTICULATED IN AEREO

### A. Precedent Can Be Overturned When It Is Clearly Irreconcilable With The Reasoning Or Theory Of Intervening Authority.

A three-judge panel can overrule prior circuit precedent without an *en banc* hearing where the reasoning or theory of the prior circuit authority is clearly irreconcilable with the reasoning or theory of an intervening higher authority. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

The Ninth Circuit applies "a more flexible approach" to this principle and has "recognized that circuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent." *Id.* at 899. Indeed, lower courts are bound not only by the holdings of higher courts' decisions but also by their "mode of analysis." *Ibid*.

---

[2] As Miller has already pointed out in his Opening Brief, nearly ever court outside of the Ninth Circuit to address the "server test" has rejected its application.

[3] Some courts have opined that the "server test" should be limited to search engines such as the Google search engine that was the subject of the decision in *Perfect 10, II*. *See Goldman*, 302 F. Supp. 3d at 590 (S.D.N.Y. 2018) (citing cases). While that argument seems to have some surface appeal, the colloquial term "search engine" is typically used to describe a host of varied and complex technologies. *See VHT, Inc.,* 918 F.3d at 742 ("[T]he label 'search engine' is not a talismanic term that serves as an on-off switch" rather a court must be cognizant of "the importance of considering the details and function of a website's operation" in making determination of infringement.). In his opening brief, Miller advocates for this Court to consider replacing the "server test" with a simple fair use analysis in order to address the policy objectives that the "server test" originally sought to advance without requiring future courts to wade through hyper technicalities to determine whether a particular mode of content delivery is infringing or not. *See* Opening Brief, section I.D

"[I]ssues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Id.* at 900.

As will be explained more fully below, the reasoning articulated in the Supreme Court's holding in *American Broadcasting Cos. v. Aereo, Inc*., 573 U.S. 431 (2014) is clearly irreconcilable with the "server test" articulated in *Perfect 10, II*. To date, the Ninth Circuit has never had occasion to directly consider whether, in light of *Aereo*, the "server test" remains good law in cases where a photograph does not reside on a server controlled by an alleged infringer.

As explained more fully below, the reasoning of *Aereo* is clearly irreconcilable with the "server test." Therefore, the District Court should be reversed, and the case remanded.

**B.    The "Server Test" Has Not Been Expressly Affirmed After *Aereo*.**

4Internet contends that the "server test" has been expressly affirmed by the Ninth Circuit after *Aereo*. However, the three cases cited by 4Internet do not expressly apply or affirm the "server test."

First, 4Internet cites to *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) ("*Giganews*"). While the *Giganews* court cited both to *Aereo* and *Perfect 10, II* at various points in its decision, the issues presented in *Giganews* had nothing to do with the "server test." In fact the phrase "server test" does not appear in the decision at all. Rather, the decision was focused on the issue of volitional conduct, which is a requirement to state a claim for direct infringement, and which is not at issue on this appeal. The *Giganews* court did not address the "sever test" let alone reaffirm its viability as 4Internet claims.

Similarly, the court in *VHT, Inc.* did not mention the "server test." Similar to *Giganews*, the decision in *VHT, Inc.* primarily addressed the volitional conduct

requirement, which is not at issue on this appeal. Like *Giganews*, the *VHT, Inc.* court did not address the "sever test" let alone reaffirm its viability as 4Internet claims.

Finally, in *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021) the court applied the "server test" to find that a photograph that *did reside* on a server controlled by the defendant was infringing. *Id.* at 1073. To date, *Bell* is the only case in the Ninth Circuit to apply the "server test" to uphold a claim for copyright infringement rather than as a mechanism to defeat it. Because the photograph in *Bell* actually resided on the defendant's server, the *Bell* court had no reason to address whether, in light of *Aereo*, the "server test" remains good law in cases where a photograph *does not* reside on a server controlled by an alleged infringer.

Indeed, since *Aereo* was decided in 2014, this Court has had no occasion to directly consider whether *Aereo* can be reconciled with the "server test" in instances where a photograph that resides on a third-party server is nonetheless exhibited for viewing on an alleged infringer's website.

Therefore, 4Internet's assertion that the "server test" has been reaffirmed in the wake of *Aereo* is simply not correct.

### C. *Aereo's* Interpretation Of The Text Of The Copyright Act Is Irreconcilable With The "Server Test."

4Internet argues that the statutory language of the Copyright Act requires that a person needs to transmit or communicate a copy of a work in order to publicly display it. Opposition at p. 13. 4Internet further argues that a "copy" is defined as a work that is "fixed." *Ibid.* According to 4Internet, its act of transmitting or communicating the Goat Photograph is not infringing under the "server test" because 4Internet never "fixed" an actual copy of the Goat Photograph onto its server, rather the Goat Photograph resided on the Post's server.

However, this reasoning is flawed because there is no dispute that a copy of the Goat Photograph was previously "fixed" on to the Post's server, and that 4Internet's use of an inline link transmitted or communicated a copy of the Goat Photograph via a completely integrated page on the 4Internet website. *See* ER-134-135, 168, 177-179, 181, 254, 256-257; *see also Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at *32 (N.D. Tex. Nov. 22, 2017) (holding that the person need not possess underlying copy in order unlawfully to transmit or communicate it to the public.)

Citing the definition section of the Copyright Act, 17 U.S.C. § 101, the court in *Aereo* observed that a "'cop[y]' of a work is simply a 'material objec[t] . . . in which a work is fixed . . . and from which the work can be perceived, reproduced, or otherwise communicated,'" and that "whether Aereo transmits from the same or separate copies" made no difference to whether its conduct was infringing. *Aereo*, 573 U.S. at 448.

Thus, according to *Aereo*, so long as a work is fixed *somewhere*, a copy exists such that any actions taken to communicate or transmit that underlying copy might be infringing whether or not the infringer was responsible for the original fixation. In that sense, the "server test" is irreconcilable with *Aereo*'s express interpretation of the statutory text, because the "server test" requires that the alleged infringer also be responsible for the prerequisite fixation, and that the fixation occur on a server controlled[4] by the infringer.

---

[4] As an example of the absurdity of this requirement, an infringer could upload a photograph to a third-party social media platform, and then inline link to the photograph from the third-party social media platform to infringer's own website. Despite the fact that the infringer caused the photograph to be "fixed" onto the social media platform's server, the inline link on the infringer's website would not be actionable under the "server test" because the infringer does not control the server of the third-party social media platform.

To "display" a work, someone need only *show* a copy of the work via any device or process. *See* 17 U.S.C. § 101. In this case, since the underlying copy of the Goat Photograph was already fixed on the New York Post server, 4Internet utilized the process of inline linking to show that copy to visit to the user via a seamlessly integrated webpage presentation.

4Internet attempts to distinguish the holding in *Aereo* by pointing out that the holding in *Aereo* was premised on the "public performance" right in §106(4) and not the "public display" right in §106(5). However, the legal analysis of these two rights are virtually identical.

The primary difference between a "public display" and a "public performance" is the underlying material. For example, works that are static in nature, such as still images or sculptures, are "publicly displayed". *See* 17 U.S.C. §106(5). In contrast, works that are dynamic in nature, such as musical compositions or motion pictures, are "publicly performed." *See* 17 U.S.C. §106(4). Thus, while the types of work themselves may differ the act of public exploitation is the same.

For this reason, the Copyright Act defines public performance and public display under the exact same definition section:

> To perform or display a work 'publicly' means—
>
> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
>
> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. §101.

In other words, while *Aereo* considered the public performance right because the underlying work, a television broadcast, was dynamic in nature, the public performance and public display right are functionally identical in terms of statutory

definition and legal analysis and the reasoning of *Aereo* can and should be applied to both the performance and display rights. Thus, even though the "server test" only involves the public display right, *Aereo*'s reasoning is still controlling.

4Internet next argues that, despite the clear language in *Aereo* eschewing invisible technical differences in favor of a more practical, functional perspective to determine whether a particular mode of content delivery is infringing, that consumer confusion as to whether a photograph is inline linked or not is an issue for trademark law, not copyright. Opposition at p. 17. However the underlying principles of *Aereo* are not concerned with whether *consumers* are confused as to the source of particular content. Rather, the issue is whether the *infringer* is utilizing technology to unlawfully appropriate a copyrighted work without the authorization.

For example, if an infringer misappropriates a photograph but provides full photo credit and attribution, a viewer would not be confused as to where the photograph originated or who the author was, yet the infringer would still be liable for copyright infringement because he exploited a work without permission. *See Narell v. Freeman*, 872 F.2d 907, 914 (9th Cir. 1989) ("[A]cknowledgment does not in itself excuse infringement.").

In that sense, 4Internet's "consumer confusion" is simply a red herring because the holding in *Aereo* is not about whether consumers are confused, but rather whether an infringer can rely on discrete hyper technical processes to evade liability for what is clearly an attempt to unlawfully exploit copyrighted works.

Here, it is clear the principles articulated by the Supreme Court in *Aereo* cannot be reconciled with the "server test." As such, this Court should hold that *Aereo* overrules the "server test," the District Court should be reversed, and the case remanded.

### D. The Doctrine Of Fair Use Is Well Established And Context Specific In Contrast To The Highly Arbitrary "Server Test."

4Internet's next argument is that the "server test" should not be replaced with "fair use" because it would unnecessarily shift the burden to defendants rather than plaintiff. However, any burden shifting would be negligible since it is typically accused infringers that raise the "server test" as a defense to infringement in the first place.

Regardless, as has been explained previously, the "server test" has been rarely invoked in this Circuit, leaving many courts confused as to its scope. Its application can also lead to "extreme or dubious results" that invite website publishers to abuse and circumvent copyright protection by simply adjusting a few lines of code. *See Perfect 10, I,* 416 F. Supp. 2d at 839. In contrast, by embracing the preexisting and robust body of "fair use" law instead, this Court could continue to maintain the policy objectives sought to be achieved by the "server test" without having to fashion a new or unproven test.

The rest of 4Internet's arguments are *ad hominem* attacks on Miller and his counsel, no doubt, meant to deflect from 4Internet's relatively weak position on the merits. As one court aptly noted:

> All such *ad hominem* attacks are merely an attempt to shift the focus of the matter from the merits of the real issues at bar ... Suffice it to say that these attacks are illogical and material fallacies raised to distract attention from the real issues in this case, and thus are not worthy of further discussion.

*In re Maurice*, 167 B.R. 114, 131-32 (Bankr. N.D. Ill. 1994) (citation omitted).

Miller will not dignify these unprofessional attacks with a further response.

### E. 4Internet's "Originality" Argument Is Inapposite And Incorrect.

Next, 4Internet makes the inapposite argument that "photography is no longer a useful art" because "everyone can do it" and because companies like Google store large amounts of photographs. Opposition at pp. 19-21. 4Internet also argues that

Miller "brazenly" misrepresents that 4Internet is a money-making venture. *Id.* at p. 21.

These arguments are irrelevant to the issues raised in this appeal. Regardless, these arguments are both factually and legally incorrect.

Regarding copyrightability of photographs, 4Internet's argument is premised on the supposed minimal amount of *effort* that goes into creating a photograph, however the Supreme Court in *Feist* specifically renounced the so-called "sweat of the brow" doctrine holding that the amount of effort expended in creating a work is not relevant to the work's ultimate copyrightability. *See Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 352-56 (1991). Instead, the *Feist* court observed that the sole inquiry to be considered was whether a work was sufficiently original. *Id.* at 345 ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. [Citation]. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. [Citation and quotation omitted].).

Pursuant to its authority derived from the copyright clause of the Constitution, U.S. Const. art. I, § 8, cl. 8, Congress has specifically chosen to afford copyright protection to "pictorial works" 17 U.S.C. § 102(a)(5). Indeed, this Court has previously observed in *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1077 (9th Cir. 2000) that "perhaps even perspective alone" would be a sufficiently original contribution to render a photograph subject to protectable copyright.

To the extent that a photograph is the product of low or minimal effort, such argument is better suited to the value of the work itself or the amount of damages

that should be awarded for infringement rather than to the issue of whether the marginal threshold of originality has been met.

4Internet's "profitability" argument is also factually and legally suspect. According to 4Internet's own deposition testimony, 4Internet admits that it registers and sells domains and also attempts to monetize its websites via paid advertising. *See* ER-120, 124-125. Whether 4Internet is ultimately *successful* at monetizing its business[5] is distinct from whether its business is a not-for-profit venture. *See Mills Music, Inc. v. Arizona*, 1975 U.S. Dist. LEXIS 11319, 1975 WL 21095 at *54 (D. Ariz. July 23, 1975) ("The term 'non-profit' as used in the law of corporations has a meaning, which is substantially different from the phrase 'not for profit' as used in the law of copyrights."); *Associated Music Publishers, Inc. v. Debs Memorial Radio Fund, Inc.*, 46 F. Supp. 829 (S.D.N.Y. 1942), aff'd, 141 F. 2d 852 (2d Cir. 1944) (where the defendant was a nonprofit organization but engaged in activities to raise funds for its expenses, the court rejected the defense of fair use.)

Assuming *arguendo* 4Internet had predominantly noble intentions in developing its technology, that is not necessarily incongruous with its clear objective to develop a profitable business. Furthermore, it would make little sense to fashion a rule of liability for infringement based on whether or not the underlying infringer was bad at business.

Thus, to the extent that this Court gives any consideration to these arguments raised by 4Internet, they should be categorically rejected.

In conclusion, the decision of the District Court should be reversed, and the case remanded for further proceedings.

---

[5] 4Internet goes through great pains to frame its business as one that is not profitable. However, many of the most successful companies in the world do not turn a profit yet clearly have a pecuniary objective. *See* https://yhoo.it/3ZZsX1D.

## IV. THE DISTRICT COURT FAILED TO CONSIDER MILLER'S SECONDARY LIABILITY THEORIES

### A. Whether Miller "Failed To Plead A Claim" For Secondary Infringement Is Not At Issue On This Appeal.

As its first argument, 4Internet contends Miller failed to plead a claim for secondary liability for infringement in his original Complaint, and therefore cannot claim the District Court's failure to consider whether the "server test" applied to Miller's secondary infringement theories as reversable error. Opposition at pp. 22-23.

However, whether Miller failed to plead a claim for secondary infringement in his Complaint was not addressed or decided by the District Court, and therefore the issue is not ripe for appeal. *See* ER-268-270; *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 1991 U.S. App. LEXIS 1160, at *6 (9th Cir. Jan. 24, 1991) ("As a general rule, a federal appellate court will not review issues on appeal not raised in the court below.").

Rather, although Miller argued theories of secondary liability on summary judgment, the District Court never addressed Miller's secondary liability theories and instead held that the "server test" was a complete defense to copyright infringement. *See* ER-268-270.

In *Perfect 10 I*, the court clearly stated that the "server test" was only meant to apply to claims for direct infringement:

> This test will merely preclude search engines from being held *directly liable* for in-line linking and/or framing infringing content stored on third-party websites. Copyright owners may still seek, as P10 does, to impose contributory or vicarious liability on websites for the inclusion of such content.

*Perfect 10 I*, 416 F. Supp. 2d at 844 (emphasis added).

Thus, the District Court should be reversed, and the case remanded for consideration of whether Miller's secondary liability theories are viable[6].

**B.    Whether 4Internet Can Be Held Secondary Liable For Infringement Is Not At Issue On This Appeal.**

4Internet's next argument is that Miller cannot succeed in establishing that 4Internet is vicariously liable because Miller cannot show that 4Internet had the ability to supervise and control the infringing activity or that it would financially benefit. Opposition at pp. 23-24.

Again, however, these factual issues were not addressed or resolved below and are therefore not ripe for adjudication on this appeal. Even if they were ripe, Miller can demonstrate that 4Internet is vicariously liable.

Vicarious liability allows imposition of liability when the defendant stands to receive a financial benefit from the infringement and has a right and ability to supervise the infringing activity, even if the defendant initially lacks knowledge of the infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, n.9 (2005); *see also Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004); *see also Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261-64 (9th Cir. 1996).

*Fonovisa*, involved a plaintiff (Fonovisa) that owned copyrights to Latin music recordings and a defendant (Cherry Auction) that operated a swap meet in Fresno, California. *Id.* at 261. Vendors paid Cherry Auction a daily rental fee in exchange for booth space. *Ibid.* Fonovisa brought an action against Cherry Auction alleging it was vicariously and contributorily liable for infringement of Fonovisa's copyrights through its vendors' sales of counterfeit recordings. The district court granted Cherry Auction's motion to dismiss the complaint, finding plaintiffs like

---

[6] It may very well be that on remand the District Court determines that Miller's secondary liability theories were not properly pled or are not viable. However, because the District Court has yet to opine on those issues, it would be improper for the Court to make that determination here.

Fonovisa could not, as a matter of law, maintain such claims against swap meets for sales by vendors who were leasing their premises.

The Ninth Circuit reversed. *Fonovisa*, 76 F.3d at 261, 265. As to the claim for vicarious copyright infringement, the court focused on the issues of Cherry Auction's control of and financial benefit from its vendors conduct. *Ibid.*

The *Fonovisa* court observed, "[a]ccording to the complaint, Cherry Auction had the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises . . . The district court's dismissal of the vicarious liability claim in this case was therefore not justified on the ground that the complaint failed to allege sufficient control." *Id.* at 262-63. The court noted that Cherry Auction's "broad contract with its vendors -- was sufficient to satisfy the control requirement." *Id.* at 263.

As to the first prong of establishing vicarious liability, it is undisputed that 4Internet has the ability to supervise and control the content on 4Jewish and 4RightWing by determining precisely the type of content that its users can be exposed to when querying the 4Interne index and how that content is ultimately presented. *See* ER-131-133, 136-137, 170. For example, 4Internet testified that it intentionally created "seed points" which are domains preselected by 4Internet based on their relevance to a specific affinity type and which were directly coded by a human into the 4Internet search algorithm. *Ibid.*

Therefore, the first prong is established.

The second prong considers whether a defendant has a financial interest in the infringing activity. Financial benefit exists where the availability of infringing material "acts as a 'draw' for customers." *Fonovisa*, 76 F.3d at 263-64 (stating that financial benefit may be shown "where infringing performances enhance the attractiveness of a venue"). Notably, the court in *Fonovisa* found the financial benefit

prong satisfied even though the swap meet did not directly receive revenue from the sales of the counterfeit recordings. *Ibid*.

Here the second prong of vicarious liability is satisfied. 4Internet is in the business of, among other things, domain sales and paid advertising. *See* ER-38, 120, 124-125, 140-145, 149-150, 160-167. 4Internet was also interested in actively developing the appearance and functionality of its webpages in order to try figure out what users would respond too, which included incorporating photographs such as the Goat Photograph. *See* ER-127-129. In other word, 4Internet clearly understood that incorporating photographs such as the Goat Photograph into the functionality and design of its websites would lead to a better user experience thus acting as a draw to users and increasing the value of the domains and advertising revenues.

4Internet contends that it never actually received any revenues, citing cherry picked deposition testimony wherein 4Internet claims that, despite clearly soliciting paid advertising on its websites, it never actually responded to those requests. However, the standard is not whether 4Internet *actually* achieved a financial benefit, rather vicarious liability turns on whether 4Internet *stands to* financially benefit for the infringing activity.

Thus, Miller has established that 4Internet is vicariously liable.

On the one hand, 4Internet concedes that it generate revenues from domain sales and paid advertising, and on the other hand, 4Internet claims that even if someone were to try and send a query through the advertising page on its websites, it would ignore them. At minimum this factual dispute about whether 4Internet's conduct satisfies the financial benefit prong is not an issue ripe to be decided on appeal. The District Court did not address the issue, and therefore this Court cannot make a determination as to whether 4Internet could be vicariously liable for infringement.

Because the "server test" does not apply to theories of secondary infringement, the District Court should be reversed, and the case remanded.

**C.    Whether An Underlying Infringement Exists Is Not At Issue On This Appeal.**

Finally, 4Internet contends that Miller's theory of vicarious infringement fails because there is no direct infringement. However, "[t]he 4Internet system automatically indexed the New York Post website and stored the metadata that would allow a user doing a search to render the image at issue upon request." ER-54. According to Post's "Terms of Service" during the relevant time period, "all content, features, and functionality … ('Services')" of the Post's website "are to be used solely for your non-exclusive, non-assignable, non-transferable and limited personal use and for no other purposes" and "you shall not, nor shall you allow any third party (whether or not for your benefit or otherwise) to, frame, reproduce, modify, create derivative works from, display, perform, publish, distribute, disseminate, broadcast or circulate to any third party (including, without limitation, on or via a third-party website or platform), or otherwise use, any Content without the express, prior written consent of Company or its owner if Company is not the owner." ER-183-185

Thus, by indexing and storing the metadata for the Goat Photograph, and then subsequently causing that stored metadata to be rendered into the browser of the user upon request, 4Internet violated the Posts, terms of service rendering its actions unauthorized in multiple respects. This underlying unauthorized conduct is a sufficient basis for finding vicarious infringement.

Regardless, the District Court never considered these issues at all. Thus, this Court cannot make a determination as to whether the underlying conduct described above is sufficient to support a finding of vicarious liability. Rather, such a determination should be made by the District Court on remand.

Therefore, the District Court should be reversed, and the case remanded.

## V.    CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed, and the case remanded for further proceedings.

Dated: March 9, 2023                    Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,258 words and 624 lines, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: March 9, 2023                    Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: March 9, 2023                    Respectfully submitted,

**/s/ Ryan E. Carreon**
Ryan E. Carreon, Esq.
Cal. Bar No. 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Ste 112
Santa Ana, CA 92705-5418
(714) 617-8336
(714) 597-6559 facsimile